[Crim. No. 3280. Second Appellate District, Division One.—April 12, 1940.]

THE PEOPLE, Respondent, v. GEORGE W. SHAFFER et al., Appellants.

Wm. J. F. Brown and Donald Mackay for Appellants.

Earl Warren, Attorney-General, Bayard Rhone, Deputy Attorney-General, Buron Fitts, District Attorney, and Jess Frampton and Logan Lindley, Deputies District Attorney, for Respondent.

YORK, P. J.—By an indictment returned by the grand jury, appellants were charged jointly in two counts with the crime of grand theft. Appellant Shaffer was also charged with two prior convictions, one of which was admitted by him and the other was stricken from the record upon motion of the district attorney. Upon trial by the court sitting without a jury, appellants were found guilty as charged in both counts of the indictment. Appellant Shaffer appeals from the judgments of conviction rendered against him, and appellant Jacobson (as to whom no judgment was pronounced, his application for probation having been granted), appeals from the order by which his motion for a new trial was denied.

A review of the record reveals briefly that in 1938 the appellant Shaffer became acquainted with one Ralph Gallinger, a wholesale dealer in New Mexico state oil leases, from whom said appellant bought three 40-acre leases for $6.50 each. These leases are issued by the State of New Mexico on 40-acre parcels of land "for the purpose of exploiting for oil", for which a charge is made ranging from $2 for wild-cat land to $4,000 for land "adjacent to production", plus a yearly rental of 5 cents per acre, all of which is paid directly to the State of New Mexico. It appears that the State of New Mexico has set up this leasing arrangement in order to get money to support its institutions and "is not interested whether there is oil there or not." Gallinger maintained an organization in New Mexico which contacted the state land office and attended to the details there in con-

nection with obtaining the leases which he in turn sold by assignment to other persons.

In January, 1939, appellant Shaffer introduced appellant Jacobson and a man named Caples to said Gallinger, who immediately thereafter sold three leases to appellant Jacobson, i. e., an 80-acre lease for $25, a 240-acre lease for $39, and a 158.78-acre lease for $21, with assignments in blank. It was agreed that these leases should be sold and the proceeds divided equally between appellants and Caples. In this venture appellant Jacobson invested $85, the purchase price of the three leases, and appellant Shaffer and Caples contributed their experience in the oil business.

Mrs. Russell, the complaining witness, and her husband were an elderly couple residing in Glendale, having retired from the millinery business in which they had formerly engaged. They owned a number of leases on so-called wildcat oil land in Chaves County, New Mexico, and had paid $500 each for two of these leases. They possessed maps of Chaves and Lincoln Counties, New Mexico, and received reports from the State of New Mexico as to current activities in that particular territory.

Some time in January, 1939, appellant Shaffer called at the Russell home and introduced himself as a Mr. Walbridge, stating that he was interested in oil and in oil land; that he was a vice-president of the Texa Homa Oil Company with offices in Albuquerque, New Mexico, and that he was buying oil leases. He told the Russells that he had just arrived from Albuquerque by plane and had taken a taxicab from Burbank to their home.

About a week later, appellant Jacobson called on the Russells and told them that he had some leases of land in Chaves and Lincoln Counties, New Mexico, and that he wanted to sell two of them, to wit: A 240-acre lease and another for 158.78 acres, at a price of $10 per acre. Mrs. Russell brought out her maps and after some discussion bought the two leases paying appellant Jacobson therefor a total consideration of $3,980. After deducting his initial investment of $85 therefrom, appellant Jacobson divided the remainder between himself, appellant Shaffer and Caples. According to her testimony, Mrs. Russell was told by appellant Jacobson that the "geologists had been to work in that field and they had every assurance that there was oil to be made; major oil

companies had been working there with these geologists . . . there was lots of money to be had if I would buy the leases. He was willing to sell at a very low price. He also said he had 80 acres that he was reserving that he didn't care to sell at that time." It appears that Mrs. Russell had two or three conversations with appellant Jacobson with respect to this 80-acre lease which he considered more desirable than the two leases he had already sold to her, but that he did not know to whom he could sell it. He did not have the description of this lease with him, but he subsequently telephoned it to her, and Mrs. Russell wrote it down on a piece of paper which was introduced in evidence as plaintiff's exhibit 13. Finally, he offered the 80-acre lease to Mrs. Russell at $30 per acre.

Shortly after Mrs. Russell received the description of the lease from appellant Jacobson, the appellant Shaffer, *alias* Walbridge, again drove up to the Russell home in a taxicab, saying that he had come from Albuquerque by plane and that he wanted to buy a certain lease but did not know where he could find out who owned it. Mrs. Russell then told him about the 80-acre lease and read to him the description which appellant Jacobson had given her over the telephone. Thereupon, appellant Shaffer, *alias* Walbridge, said it was just what he wanted "because the major oil companies were near and they were going to drill very soon and that he could make good money out of this . . . he was buying it for the Texa Homa Oil Company. . . . He was out buying for the Texa Homa Oil Company and he wanted to get some good leases there, big money in it, and if he could get this particular lease it was just what he wanted, and he said he was taking another plane for San Francisco to see further customers there." With reference to this 80-acre lease, Mrs. Russell testified on cross-examination as follows: "Mr. Walbridge (Shaffer) offered me $60 per acre if he could get this particular lease, a $5,000 bonus when they produced oil and a ⅛ royalty for the lease"; that he promised to buy it from her as soon as she could get the lease back from New Mexico. "He put the figures down on a piece of paper what he would pay for it." She further testified that she had no real knowledge of it except what appellant Jacobson had given her "the description of the lease." When asked, "And when you purchased this 80 acres you purchased it because you believed it was a good buy?", she replied, "I purchased it be-

cause Mr. Walbridge (Shaffer) said he would buy it from me at double the price I would pay.''

On February 21, 1939, Mrs. Russell purchased the 80-acre lease from appellant Jacobson and gave him two checks totaling the full amount of the purchase price at $30 per acre. One check for $1877.50 was paid and the money derived therefrom was divided between appellants and the said Caples. Payment was stopped on the other check for $362.50 which was postdated, and when appellant Jacobson contacted Mrs. Russell with regard thereto, she told him she stopped payment on the check because her account was short. That was the last time Mrs. Russell saw appellant Jacobson during the transaction in question. He told her he was going to Colorado, but before leaving he gave appellant Shaffer permission to collect the $362.50 check, and the next day the latter called upon Mrs. Russell and told her the title to the lease was not clear, that there was an attachment against it and that he could not buy it from her until the $362.50 was paid. In company with appellant Shaffer, Mrs. Russell went to her bank and withdrew from her savings account sufficient money with which to pay appellant Shaffer the amount of the check. The lease was then forwarded to the Land Office in New Mexico where it was recorded and subsequently returned to Mrs. Russell. Appellant Shaffer, *alias* Walbridge, never bought the lease from Mrs. Russell and it was admitted by appellant Jacobson that he authorized appellant Shaffer to collect the $362.50. About a week after this check transaction took place, someone called Mrs. Russell on the telephone and told her Mr. Walbridge had been killed instantly. She did not see him again until after the indictment was returned when he called at her home in Glendale. Mrs. Russell testified that neither man mentioned the name of the other during the entire transaction, commenting ''Apparently they didn't know each other.''

Appellant Jacobson testified that when the first two leases were sold to Mrs. Russell the sum of $400 was paid to a man by the name of Hendricks or Henriquez, who had furnished the name of the Russells ''as a prospective purchaser''. Also, that during the transactions with the Russells he saw appellant Shaffer every two or three days, but to his knowledge appellant Shaffer did not contact the Russells at all, although Shaffer had told him that he would help him sell the leases. However, appellant Jacobson admitted that he

had told appellant Shaffer that Mrs. Russell "was interested in buying the 80 acres, and that I was going to sell it to her"; that she had a "deal with the Standard Oil Company to sell her holdings, and we had agreed that if she could use it she would pay me $30 an acre, and I was to call her and give her the description." Appellant Jacobson also admitted upon cross-examination that he told Mrs. Russell that this 80-acre lease was within a few miles of oil production. This statement was definitely shown to be false.

Mrs. Russell's testimony was corroborated by her husband, Leroy E. Russell, who was with her at all times during the instant transaction.

A deputy real estate commissioner for the State of California, who was a graduate engineer of the University of Arizona, testified that his office had a sectionalized geographical map of Chaves County, New Mexico, which had been prepared under the direction of the Department of the Interior of the United States government; that this map showed, among other things, the oil fields, and all the drilling and abandoned wells in the said area to approximately June 1, 1939; that he had actually been on the ground in Chaves County and had spent ten days there in June,.1939; that no major oil company had ever drilled in Chaves County and that the rental prices of land surrounding the 80-acre parcel was 5¢ an acre per year, or $2 for 40 acres; that there was at that time no oil production to the west of the described property; that approximately 15 to 18 miles due west of the west side line of Township 14, there were three dry and abandoned holes; to the north there was a new well, the High Tower, which was listed as a producer, but that when said witness was on the property thirty days prior to the time he testified, said well was not producing; that there was a well in Township 13, drilled to 3,750 feet, which was dry and abandoned, and still further east, 32 to 35 miles, the Kauf-Brown well had been drilled to 5,127 feet but that also had been abandoned, the bottom of the hole being filled with salt water; that Lincoln County adjoins Chaves County on the west, and that there was no oil production and no prospects therefor in Lincoln County.

Appellant Shaffer neither testified nor produced any evidence in his own defense.

The charge of grant theft contained in the first count of the indictment is based upon the check for $1877.50, and the

second count is based upon the sum of $362.50, which amounts were paid by Mrs. Russell to appellants in payment for the 80-acre lease hereinbefore referred to.

Appellants urge on this appeal that the evidence is insufficient to sustain the convictions of guilt, and that the court erred in its rulings with respect to the admission of evidence. It is claimed that the evidence fails to meet the requirements necessary to constitute any one of the offenses which are included in the crime of grand theft, i. e., embezzlement, larceny by trick and device and false pretenses, and in support of this theory, appellants have listed in their briefs approximately twenty-five representations which were made by them to Mrs. Russell, and then proceed to attack each representation in an effort to show that it was either a mere future promise, an expression of opinion, or, although admittedly false, was not relied upon.

The evidence adduced at the trial herein shows conclusively that appellants planned and put into execution a fraudulent scheme by means of which they induced the complaining witness to part with a substantial sum of money in return for a practically worthless oil lease. These two men worked together in an effort to sell the leases at a profit, but during the negotiations which they carried on with Mrs. Russell, neither one mentioned the other, although they saw each other frequently during this period. While it is undoubtedly true that the complaining witness did not rely upon any particular statement made to her by appellants, a consideration of the transaction as a whole, together with the circumstances surrounding the same, reveals that these two men by false statements and nicely timed visits worked upon the credulity of Mrs. Russell until she became imbued with the idea that she was acquiring a lease which she could sell to appellant Shaffer at a great profit to herself. Had she known that appellants were working together, the plan could never have been accomplished. Appellant Shaffer led her to believe that he was an officer of a responsible oil company actively engaged in drilling operations in Chaves County, New Mexico, and that he was negotiating for the purchase of leases for such company; also that such transactions were of sufficient importance to warrant the company in sending an executive from Albuquerque to Los Angeles and San Francisco by plane.

The false representation made by appellant Shaffer to the effect that he was negotiating for leases for the Texa Homa Oil Company, a purely fictitious entity, was in itself sufficient to sustain the judgments of conviction. (*People* v. *Fisher,* 116 Cal. App. 243 [2 Pac. (2d) 564].) Moreover, after appellants discussed the possibility of selling the 80-acre lease to the complaining witness at a price of $30 per acre, and after appellant Jacobson had telephoned the description of said lease to her, appellant Shaffer appeared at her home and falsely stated that he did not know who owned the said lease. Taken as a whole, the transaction here involved reveals that appellants conspiring together with intent to defraud, deceived Mrs. Russell by presenting to her a picture which was purely fictitious and fraudulent, and as a climax offered to buy the lease from her at double the price they were asking her for it.

The evidence in its entirety is not conflicting, and the court properly drew the inferences of guilt therefrom.

■ Each appellant urges that the trial court erred in allowing the conversation of the other to be admitted in evidence. As has heretofore been shown, appellants were co-conspirators and by their joint efforts succeeded in selling all three leases to Mrs. Russell. At the start, appellant Shaffer agreed to help appellant Jacobson sell the leases for which he had paid Gallinger the sum of $85. Furthermore, Shaffer gave to Jacobson the name of the Russells and told him to contact them and attempt to sell the leases to them, and after the sale of the first two leases, Jacobson agreed to pay Hendricks $400 out of the profits realized for merely supplying the name of the Russells to Shaffer. It will be recalled that Shaffer first called upon the Russells and told them he was negotiating for oil leases for his company; that immediately after Jacobson approached them and attempted to sell the first two leases, and after that sale was completed, Shaffer next visited the Russells after Jacobson had telephoned to Mrs. Russell the description of the 80-acre lease, and when Jacobson was unsuccessful in collecting the last check for the 80-acre lease, Shaffer again appeared on the scene and collected the money. Shaffer finally called upon Mrs. Russell after the indictment was returned against him. Due to the fact that it was conclusively shown that these two men were co-conspirators, there was no error in the admission of the evidence complained of.

■ Both appellants object to the admission of evidence as to the value of the 80-acre lease. The witness Gallinger, as a matter of fact, was an expert. For a period of years he had been engaged in selling New Mexico oil leases, and it was shown that he owned some of these leases. It is well established that an owner of property may testify as to its value. (*People* v. *More,* 10 Cal. App. (2d) 144 [51 Pac. (2d) 175].) ■ Both appellants also object to the introduction into evidence of the transactions by which said Ralph Gallinger sold three oil leases to appellant Shaffer in 1938 for $6.50 each, claiming the same was prejudicial by reason of the fact that it would imply that Shaffer had defrauded other persons. All this evidence amounts to is to show that Shaffer had established contacts with Gallinger previous to the instant transaction. It does nothing more than identify the parties, the business that they were engaged in, and the fact that business had been conducted previous to the instant transaction.

■ Appellants object to the admission in evidence of the telephone conversation to the effect that Mr. Walbridge had been killed in an accident. So far as the record shows, only Shaffer, Jacobson and the Russells had any knowledge that Shaffer, *alias* Walbridge, of Albuquerque, New Mexico, was negotiating to purchase the 80-acre lease from Mrs. Russell, and this conversation which would tend to lull Mrs. Russell into a state of inactivity, benefited not only Shaffer but Jacobson, also. This evidence was admissible as a part of appellants' plan to defraud.

■ Appellant Jacobson cites as error the admission in evidence of the testimony of the deputy real estate commissioner with reference to the map of Chaves County, New Mexico. It was shown that this map was prepared by the Department of the Interior of the United States government and the witness testified he had personally covered the territory during the early part of June, 1939, and had visited every well in Chaves County. There was no error in allowing this map to be introduced in evidence. (Sec. 1936, Code Civ. Proc.)

■ Finally, it is claimed that the court erred in allowing in evidence the first two leases and the checks which Mrs Russell gave to appellant Jacobson in payment therefor. This evidence was admissible to show that there was a defi-

nite tie between appellants at the time in question; neither appellant was prejudiced by it.

For the foregoing reasons, the judgments and the order appealed from are, and each of them is, affirmed.

Doran, J., and White, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on April 24, 1940, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 9, 1940.